IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHESTNUT HILL ACADEMY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION |
| GRAPHIC ARTS MUT. INS. CO. & | : | NO. 04-1560 |
| UTICA MUT. INS. CO., | : | |
| Defendants/ | : | |
| Third Party Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| ST. PAUL FIRE AND MARINE INS. CO. | : | |
| Third Party Defendant | : | |
| | : | |

**Memorandum and Order**

Yohn, J.                                                                July ____, 2005

Pending before the court is plaintiff Chestnut Hill Academy's motion for partial summary judgment on its breach of contract claim against defendants Graphic Arts Mutual Insurance Company and Utica Mutual Insurance Company. Also pending is defendants' motion to strike, or in the alternative, to continue plaintiff's motion for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56(f). After considering the parties' memoranda and hearing oral argument on the motions, I will deny defendants' motion to strike and grant plaintiff's motion for partial summary judgment, for the reasons stated herein.[1]

---

[1] Counsel are reminded of the court's scheduling order, which limits opening and response briefs to twenty-five pages and reply briefs to seven pages. Further violations of this order will result in the striking of the excess pages.

1

## I. Factual Background

This case arises out of a dispute over the parties' respective rights and obligations under two insurance policies. Plaintiff Chestnut Hill Academy ("CHA"), a private primary and secondary school for boys, was insured in November 2002 under a commercial liability insurance policy issued by defendants Graphic Arts Mutual Insurance Company and/or Utica Mutual Insurance Company ("Graphic Arts/Utica").[2] It was also insured under a non-profit organization liability policy issued by third-party defendant St. Paul Fire and Marine Insurance Company ("St. Paul").

On November 4, 2002, CHA, the chairman of its board of trustees, and three of its employees[3] were named in a lawsuit filed in the Court of Common Pleas for Philadelphia County by Andrew Rosenau, a student, and his parents, Lee and Laurie Rosenau. The Rosenau suit arose out of CHA's efforts to discipline Andrew Rosenau for his involvement in an off-campus incident that school administrators believed warranted his expulsion. The Rosenaus sued for breach of contract, negligent infliction of emotional distress, and defamation. They sought

_____

[2]It is unclear from the parties' pleadings and briefs what the precise relationship is between Graphic Arts and Utica. The complaint asserts that Graphic Arts is a subsidiary of Utica. *See* Second Amended Complaint ("SAC") at 2 fn.1.The policy documents bear the names of both "Utica National Insurance Group" and "Graphic Arts Mutual Insurance Co." *See* SAC, Exhibit A. Correspondence to CHA concerning the claim at issue in this case is on the letterhead of "Utica Mutual Insurance Company and its affiliated companies" and discusses the rights of Graphic Arts under the policy. *See id.*, Exhibit D. Defendants dispute plaintiff's characterization of the relationship between Graphic Arts and Utica as a parent/subsidiary relationship, but they make no alternative characterization of the relationship. *See* Answer at ¶ 3. Given that policy documents and letters relating to coverage bear the names of both Graphic Arts and Utica, I will treat them for purposes of this motion as a single entity denominated "Graphic Arts/Utica."

[3]The individual employees named in the suit were Francis P. Steele, Jr., Headmaster of CHA; Jerome Murphy, Dean of Students; and Judd Livingston, Head of the Upper School.

equitable relief, in the form of an injunction to prevent CHA from expelling Andrew Rosenau, and money damages for personal injuries and economic loss.

When CHA received notice of the Rosenau suit, it promptly contacted the law firm of Ballard, Spahr, Andrews & Ingersoll ("Ballard Spahr"), with which it had an existing relationship, and asked Ballard Spahr to proceed on its behalf.[4] It also contacted Graphic Arts/Utica and St. Paul to give notice of the suit and to request a legal defense in the action.[5] By letter dated November 18, 2002, Graphic Arts/Utica acknowledged "without prejudice" receipt of CHA's claim relating to the Rosenau litigation, and stated that "there may be a question of whether coverage is afforded under the existing policy for this loss." *See* SAC, Exhibit D; Answer at ¶ 20. In the letter, Graphic Arts/Utica announced its intention to "investigate this matter and take whatever steps are necessary to protect our mutual interests with the understanding that we do so under a complete Reservation of Rights." *See* SAC, Exhibit D By letter dated November 25, 2002, St. Paul acknowledged coverage under its policy and agreed to retain Ballard Spahr, which had already been acting on behalf of CHA in preliminary matters relating to the case, pursuant to standard company guidelines and a specified fee structure. *See* SAC, Exhibit E.

In its letter of November 18, Graphic Arts/Utica did not agree to retain Ballard Spahr or any other law firm as counsel for CHA.[6] *See* SAC at ¶ 22; Answer at ¶ 22. Nor did it express any

---

[4]Speed was important to this retention, because the state court had scheduled a prompt hearing on the request for injunctive relief.

[5]The timeliness and adequacy of the notice are uncontested.

[6]CHA interprets the November 18 letter to constitute an acknowledgment by Graphic Arts/Utica that it had a duty to provide CHA with a defense of the Rosenau action. Graphic

3

intention to retain counsel to represent CHA. Instead, it referred the matter to attorney Jeffrey Quinn to "monitor" Ballard Spahr's defense of the litigation.[7] *See* SAC at ¶ 22; Answer at ¶ 22 and ¶38. Quinn's monitoring on behalf of Graphic Arts/Utica began with a letter update from Ballard Spahr on January 8, 2003. *See* SAC, Exhibit G; Answer at ¶ 24. Along with the letter, Ballard Spahr sent Quinn a number of legal documents relating to the litigation, including pleadings, orders, and memoranda. *See id.* A series of letters followed between Ballard Spahr and Quinn concerning the status of the case, including an update from Ballard Spahr in March 2003 on settlement negotiations between CHA and the Rosenaus. *See* SAC, Exhibits J, K, L; Answer at ¶¶ 30-33. As of July 7, 2003, no settlement had been reached in the case. *See* SAC, Exhibit L; Answer at ¶ 33.

In August 2003, CHA requested reimbursement for its legal fees from Graphic Arts/Utica. *See* SAC at ¶ 34. The request was denied. *See* SAC, Exhibit M; Answer at ¶ 34. In its letter denying reimbursement, Graphic Arts/Utica stated that "Utica National Insurance company had not agreed to retain [CHA's] personal counsel...to handle defense of this action." *See* SAC, Exhibit M. Graphic Arts/Utica also asserted that the commercial liability policy it issued to CHA "does not afford coverage" for claims in which injunctive relief is sought. *See id.*

On December 4, 2003, the Rosenaus filed an amended complaint in the underlying litigation. *See* SAC, Exhibit N; Answer at ¶ 36. The amended complaint reasserted all of the

---

Arts/Utica interprets the letter differently and denies that the letter in any way conceded the existence of a duty to defend. On its face, the letter reserves rights but offers no defense.

[7]At one point, Graphic Arts/Utica asserted that Quinn had been retained to act as CHA's defense counsel in the litigation. *See* SAC, Exhibit R. Graphic Arts/Utica later acknowledged, however, that any assertion on its part that Quinn had been appointed to actually defend CHA was a "mistake." *See* Plaintiff's Partial Motion for Summary Judgment, Exhibit F.

original claims and added a promissory estoppel claim and demands for specific performance, refund of tuition monies, and punitive damages. *See* SAC, Exhibit N. CHA forwarded a copy of the amended complaint to Graphic Arts/Utica and was again informed, by letter dated December 12, 2003, that "there may be a question of coverage" and that Graphic Arts/Utica would "investigate this matter and take whatever steps are necessary to protect our mutual interests with the understanding that we do so under a complete Reservation of Rights." *See* SAC, Exhibit O; Answer at ¶ 37.

Following submission of the amended complaint, Graphic Arts/Utica retained the law firm of Mallon & Blatcher to represent CHA in the Rosenau case. *See* SAC at ¶ 39; Answer at ¶ 39. By letter dated December 23, 2003, Graphic Arts/Utica notified CHA of the appointment of Mallon & Blatcher and admitted that "Counts 3 through 8 [of the amended Rosenau complaint] fall within the purview of the General Liability Coverage provided by the Company."[8] *See* Plaintiff's Reply Brief, Exhibit J; Answer at ¶ 39. CHA expressed opposition to a change in counsel so late in the case, but it eventually acquiesced to Mallon & Blatcher's taking over its defense. *See* SAC, Exhibits Q - T; Answer at ¶¶ 40-43. Mallon & Blatcher entered its appearance on behalf of CHA on April 5, 2004. *See* SAC at ¶ 45.

In July 2004, the Rosenau case settled. Graphic Arts/Utica paid the settlement amount in its entirety but did not reimburse CHA for any of Ballard Spahr's legal fees. *See* SAC at ¶ 46; Answer at ¶ 46. Graphic Arts/Utica disclaims responsibility to CHA for any of the legal fees owed to Ballard Spahr arising from the defense of the Rosenau litigation. St. Paul provided

---

[8]Counts three through eight of the Amended Complaint were virtually identical to the corresponding counts in the original complaint. *See* SAC, Exhibits B, N.

5

partial reimbursement of Ballard Spahr's legal fees but has declined to pay the balance. St. Paul maintains that the fees billed by Ballard Spahr are excessive, that Ballard Spahr failed to follow the guidelines provided by St. Paul, and that Graphic Arts/Utica, under the terms of the policy it issued to CHA, bears primary responsibility for the balance of the cost of CHA's defense.

## II. Procedural History

CHA brought suit against Graphic Arts/Utica on April 9, 2004. The complaint alleged breach of contract, bad faith, violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, and breach of duty of good faith and fair dealing. Graphic Arts/Utica answered the complaint on July 6, 2004 and filed a third-party complaint against St. Paul on September 23, 2004. St. Paul answered the Utica/Graphic Arts complaint on November 30, 2004. On December 27, 2004, CHA filed a motion for leave to amend its complaint to state causes of action against third-party defendant St. Paul, pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, and to state additional causes of action against defendants Graphic Arts/Utica, pursuant to Rule 15(a).[9]

By order dated January 25, 2005, I denied CHA's motion to amend the complaint to add causes of action against Graphic Arts/Utica and granted the motion to amend as to St. Paul. On January 27, 2005, CHA filed its amended complaint, adding claims against St. Paul for breach of contract, bad faith, violation of the Pennsylvania Unfair Trade Practices and Consumer

---

[9]CHA sought to amend the complaint to add a bad faith claim against Graphic Arts and Utica relating to their conduct in a separate matter, *Sharp v. Chestnut Hill Academy*, Phila. C.C.P. July Term, No. 2586, a case arising after November 2004 and, ostensibly, also involving CHA's insurance coverage under the Graphic Arts/Utica policy.

Protection Law, and breach of duty of good faith and fair dealing.[10] On February 11, St. Paul

answered the amended complaint and asserted a cross-claim and a counterclaim against Graphic

Arts/Utica.

On February 28, 2005, CHA filed the instant motion for partial summary judgment, in

which St. Paul partially joined. CHA seeks summary judgment on two specific issues: (1)

whether Graphic Arts/Utica had a duty to provide CHA with a defense in the Rosenau litigation

under the terms of the Graphic Arts/Utica Policy, and, if so, (2) whether Graphic Arts/Utica

breached that duty when it failed to retain counsel to represent CHA from the outset of the

litigation. On March 14, Graphic Arts/Utica responded to CHA's partial motion for summary

judgment and filed a Rule 56(f) motion to strike it on the ground that the record is insufficiently

developed to allow decision of the breach of contract claim. On April 12, the parties appeared for

oral argument.

**III. Legal Standards**

Either party to a lawsuit may file a motion for summary judgment, and it will be granted

only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[10]CHA also made several minor changes to the portions of the complaint relating to
Graphic Arts/Utica. On January 31, Graphic Arts/Utica wrote to CHA objecting to those changes.
The parties subsequently attempted, without success, to reach a stipulation with respect to the
minor changes in the amended complaint relating to Graphic Arts/Utica. On February 16,
Graphic Arts/Utica filed a motion to strike the portions of the amended complaint that pertained
to it and to substitute the corresponding portions of the original complaint.On April 4, I denied
Graphic Arts/Utica's motion to strike and granted CHA leave to file a second amended complaint
incorporating the specific changes described in a stipulation proposed by CHA to Graphic
Arts/Utica in a letter dated February 22, 2005. On April 14, CHA filed its second amended
complaint, which Graphic Arts/Utica answered on April 30 and St. Paul answered on May 24.

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party

bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the

nonmoving party must present "specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts

that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

which a rational person could conclude that the position of the person with the burden of proof

on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743

(3d Cir. 1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Furthermore, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Id*.

"Summary judgment may not be granted . . . if there is a disagreement over what inferences can

be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d

at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does

not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson*

*v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more

than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden

of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita*, 475 U.S. at 587 (citations omitted).

In applying the summary judgment standard to the present case, the court is guided by

Pennsylvania insurance law, which requires that an insurance policy be read as a whole and construed according to the plain meaning of its terms. *See The Frog, Switch & Mfg. Co., Inc. v. The Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999); *C.H. Heist Caribe Corp. v. American Home Assur. Co.*, 640 F.2d 479, 481 (3d Cir. 1981). Ambiguities must be resolved in favor of the insured and are found to exist only where reasonable people could, in the context of the entire policy, ascribe different meanings to the terms in question. *The Frog, Switch & Mfg. Co., Inc.*, 193 F.3d at 746; *C.H. Heist Caribe Corp.*, 640 F.2d at 481. Where an insurance policy creates a duty to defend, Pennsylvania law is well-settled and requires that an insurer tender a defense whenever an underlying complaint against its insured may potentially come within the scope of insurance coverage. *The Frog, Switch & Mfg. Co., Inc. v. The Travelers Ins. Co.*, 193 F.3d at 746; *see also American Contract Bridge League v. Nationwide Mut. Fire Ins. Co.*, 752 F.2d 71, 75 (3d Cir. 1985) (duty to defend arises even if the allegations in the underlying complaint are groundless, false, or fraudulent). If some of the allegations in the complaint fall within the terms of coverage and others do not, the insurer is obliged to defend the entire action against the insured until there is no possibility that the underlying plaintiff could recover on a covered claim. *The Frog, Switch & Mfg. Co., Inc.*, 193 F.3d at 746; *Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.*, 766 F. Supp. 324 (E.D. Pa. 1991). The duty to defend is in this respect broader than the duty to indemnify. *The Frog, Switch & Mfg. Co., Inc.*, 193 F.3d at 746. In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured. *Id.* An insurer who refuses to defend a claim potentially within the scope of the policy does so at its own peril. *Ripepi v. American Insurance Cos.*, 349 F.2d 300, 303 (3d Cir. 1965).

**IV. Discussion**

   *A. Graphic Arts/Utica's Motion to Strike*

   Before I may consider the merits of CHA's motion for partial summary judgment, I must

decide Graphic Arts/Utica's motion to strike it or, in the alternative, to stay it pending the

completion of discovery, pursuant to Federal Rule of Civil Procedure 56(f). Rule 56(f) provides

that the court may deny or order continuance of a motion for summary judgment should it appear

from the affidavits of a party opposing the motion that the party cannot, for reasons stated,

present by affidavit facts essential to justify the party's opposition. *See* Fed. R. Civ. Pro. 56(f).

Graphic Arts/Utica argues that, due to the premature nature of CHA's motion, it has not yet been

able to obtain necessary discovery, including material affidavits from third parties. CHA counters

that discovery on the breach of contract claim is unnecessary because the motion raises purely

legal issues. In addition, CHA argues, Graphic Arts/Utica's motion to strike is deficient on its

face because it relies on mere generalities, which are an insufficient basis for Rule 56(f) relief.

   In order to justify delaying the resolution of a motion for summary judgment, a Rule 56(f)

motion must go beyond generalities and identify with specificity "what particular information is

sought; how, if uncovered, it would preclude summary judgment; and why it has not been

previously obtained." *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir. 1989) (quoting *Dowling

v. City of Philadelphia*, 855 F.2d 136, 140 (3d. Cir. 1988)). In support of its Rule 56(f) motion,

Graphic Arts/Utica submitted an affidavit by its counsel, Chester Darlington. The affidavit

contains averments that the defense needs numerous documents and depositions that are expected

to "contain information vital and material to the defense of this case and to the defense of the

instant motion for partial summary judgment." *See* Defendants Graphic Arts Mutual Insurance

Company and Utica Mutual Insurance Company's Memorandum of Law in Support of its Motion to Strike, Exhibit A.  The information is necessary to its defense, Graphic Arts/Utica argues, because it would prove "acts of noncooperation and breaches of the policy by Plaintiff and Ballard Spahr." *See id.* at 22.

Defendants fail to specify, however, as required by the cases interpreting Rule 56(f), what specific acts of non-cooperation they hope to prove and, as importantly, how proof of such acts would preclude summary judgment in plaintiff's favor.[11] The same goes for facts relating to CHA's alleged breach of the policy's consent clause.[12] Graphic Arts has not specified what additional facts it hopes to uncover to prove that CHA breached the policy's consent clause. Moreover, even if Graphic Arts/Utica were more specific with respect to the facts it hopes to uncover, proof of CHA's breach of the consent and cooperation clauses, without more, would not be enough to defeat summary judgment in favor of CHA. To mount a viable defense to CHA's breach of contract claim based on the argument that CHA breached the policy's consent and cooperation clauses, Graphic Arts/Utica would have to show that its interests in the underlying litigation were prejudiced by the alleged breaches.[13] But Graphic Arts/Utica does not argue

---

[11]The policy requires the insured to "cooperate with us in the investigation, or settlement of the claim or defense against the 'suit.'"

[12]The provision states: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without out consent."

[13]For a breach of an insurance policy's consent clause to rise to the level of a material breach sufficient to excuse performance (and create a viable defense to a claim of breach of contract), it must have prejudiced the insurer's position in the underlying litigation. *See Granary Assoc., Inc. v. Evanston Insurance Co.*, No. 99-5154, 2000 U.S. Dist. LEXIS 17405 at *18 (E.D. Pa. December 4, 2000) (insured's literal breach of consent provision does not avoid liability; proof of breach plus prejudice to the insurer's interests is required); *Harrisburg Area Cmty.*

anywhere in its Rule 56(f) motion or in its answer to the Second Amended Complaint that it was prejudiced by CHA's retention of Ballard Spahr, let alone that it expects to uncover specific facts essential to prove such prejudice.

The cases granting Rule 56(f) motions emphasize the importance of specificity on the part of the non-moving party with respect to both the facts it expects to uncover through additional discovery and the necessity of those facts to the defense of the motion. *See, e.g., Hancock Industries v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1987) (holding that it is inadequate merely to state that "information is known to us, that simply must be pursued via discovery and deposition before the plaintiffs are in a position to respond"); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 926 (2d Cir. 1985) (requiring non-moving party to explain what facts are sought and how those facts are reasonably expected to create a genuine issue of material fact); *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980) (holding that the non-movant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts). Not only is Graphic/Arts Utica consistently vague in its description of the facts it expects to uncover, it has failed to establish that there is a necessary

_____

*College v. Pacific Employers Ins. Co.*, 682 F. Supp. 805, 810 (M.D. Pa. 1988) (requirement of prejudice applies to alleged breaches of both notice and consent clauses); *Paxton Nat'l Ins. Co. v. Brickajlik*, 522 A.2d 531, 532 (Pa. 1987) (breach of cooperation clause/consent clause is material only insofar as it "results in a substantial prejudice and injury to [the insurer's] position in the matter"); *Zourelias v. Erie Ins. Group*, 691 A.2d 963, 966 (Pa. Super. 1997) (insured's breach of a consent clause was material where the breach deprived the insurer of its subrogation rights).

A showing of prejudice is also required to defend on the basis that an insured breached a policy's cooperation clause. *See Assoc. Indemnity Corp. v. Davis*, 136 F.2d 71, 74 (3d Cir. 1943) (reading Pennsylvania law to require a showing of "substantial prejudice and injury to the insurer's position"); *Forest City Grant Liberty Assoc. v. Genro II, Inc.*, 652 A.2d 948, 951 (Pa. Super. 1995) (holding that a failure to cooperate "must be substantial and will only serve as a defense where the insurer has suffered prejudice"); *Paxton Nat'l Ins. Co.*, 522 A.2d at 532 (requiring a showing of "substantial prejudice and injury" to the insurer's position).

12

relationship between any heretofore undiscovered facts and its defense of the motion for partial summary judgment.

As plaintiff argues, the resolution of the instant motion does not depend on any yet-to-be-discovered material facts relating to the parties' conduct. The record is ripe for decision: The scope of Graphic Arts/Utica's duty is defined by Pennsylvania law and the terms of CHA's policy.[14] The material facts underlying plaintiff's breach of contract claim are also in the record, either in the pleadings themselves or in the exhibits,[15] and they are not disputed. In a case such as this one, where none of the information described in a Rule 56(f) affidavit would preclude a court from ruling as a matter of law, and the case has already been vastly over-litigated, the entry of summary judgment need not be delayed. *See Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 459 (3d Cir. 2003). Where the facts of performance are not in dispute and the terms of the insurance contract are unambiguous, determining the meaning and legal effect of the contract is a question of law that is an appropriate matter for resolution on summary judgment. *McMillan v. State Mutual Life Assurance Co. of Am.*, 922 F.2d 1073, 1074 (3d Cir. 1990). Graphic Arts/Utica's motion to strike or stay will be denied.

*B. CHA's Motion for Partial Summary Judgment*

_____

[14]Graphic Arts/Utica initially objected that CHA had attached an incomplete copy of the policy to its complaint. Graphic Arts/Utica admitted at oral argument, however, that a complete copy of the policy was, in fact, already in the record as Exhibit A to Document #41.

[15]Graphic Arts/Utica has objected to the authenticity of nearly every exhibit attached to the Second Amended Complaint. This objection is incoherent, however, in light of defendant's Answer to the Second Amended Complaint, which is replete with admissions that plaintiff's exhibits appear to be "true and correct cop[ies] of the original[s]." By its pleading, defendant itself has authenticated the very exhibits to which it objects, thereby proving the baselessness its own objections. I need not enter into a document-by-document analysis, because the motion can be decided based solely on admissions in the pleadings and undisputedly authentic exhibits.

CHA seeks summary judgment only on its breach of contract claim against Graphic

Arts/Utica. It argues that, under Pennsylvania insurance law, it was owed a defense by Graphic

Arts/Utica because Counts III, V, and VI of the Rosenau complaint fell within the policy's

definition of "bodily injury."[16] Count IV of the Rosenau complaint fell within the policy's

definitions of "personal injury" and "advertising injury."[17] And the Rosenaus' claims for

monetary damages in addition to injunctive relief brought the complaint within the policy's

definition of "suit."[18]

Graphic Arts/Utica seeks to defeat summary judgment on the following grounds: that it

fulfilled its duty to CHA with respect to the Rosenau litigation by providing CHA with a defense

---

[16]The policy defines "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death." Count III of the Rosenau complaint alleged that plaintiffs suffered "emotional distress, aggravation, shock and injuries, to the nerves and nervous system, and damages" at the hands of CHA. Counts V and VI alleged that Lee Rosenau and Laurie Rosenau, respectively, experienced "pain and suffering, emotional distress, aggravation, elevated blood pressure, anxiety and the need for medication" as a result of CHA's conduct.

[17]The policy defines "personal injury" to mean "injury including mental anguish, shock, or humiliation; other than 'bodily injury'; arising out of...oral or written publication of material that violates a person's right of privacy" or "oral or written publication of material that slanders or libels a person." It defines advertising injury to include "oral or written publication of material that violates a person's right of privacy" and "oral or written publication of material that slanders or libels a person or organization." Count IV of the Rosenau complaint alleged that CHA "slandered and libeled the plaintiffs including writings to the community, all statements to the community, students, teachers and staff and otherwise accused the plaintiff, Andrew Rosenau, of crimes, sexual deeds and illegal activities when none has been committed."

[18]Under the policy, "suit" means "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' to which this insurance applies are alleged." The insuring agreement provides that Graphic Arts/Utica "will have the right and duty to defend any 'suit' seeking damages" for "bodily injury." The Rosenau complaint sought "damages in excess of $50,000" from CHA for each of Counts III, V, VI, and VII and reimbursement of the "huge expenses" allegedly incurred by the Rosenaus as a result of CHA's conduct.

for the "damages portion" of the case; that CHA voluntarily incurred its debt to Ballard Spahr without Graphic Arts/Utica's consent and thereby breached its obligation under the policy; that CHA and Ballard Spahr interfered with Graphic Arts/Utica's defense of the Rosenau case and thereby breached CHA's obligation under the policy; that St. Paul is obligated to pay for the entirety of CHA's defense, because St. Paul was the first liability insurer to tender a defense in the case and because St. Paul's coverage was primary for the claims made in the case.

The initial question is whether the complaint filed by the Rosenaus triggered the duty to defend under the Graphic Arts/Utica policy. The law is clear in Pennsylvania that the duty to defend is triggered whenever a complaint against an insured even only potentially comes within the scope of insurance coverage. *The Frog, Switch & Mfg. Co., Inc.*, 193 F.3d at 746. If the complaint contains some claims that clearly or arguably do not fall within the terms of coverage and some that arguably do, the duty to defend arises as to all claims and lasts until there is no possibility that the plaintiff in the underlying suit could recover on a covered claim. *Id.* In this case, multiple counts of the Rosenau complaint clearly fell within the policy provisions covering personal injury, bodily injury, and advertising injury. *See supra* notes 14-16. The presence of these counts in the underlying complaint triggered the duty to defend, notwithstanding the fact that the complaint also contained other counts—including claims for injunctive relief and breach of contract—that clearly fell outside the scope of coverage. *See Bracciale v. Nationwide Mutual Fire Ins. Co.*, Civil Action No. 92-7190, 1993 U.S. Dist. LEXIS 11606, at *22 (E.D. Pa. August 23, 1993) (insurer deciding whether it has a duty to defend must examine the complaint for claims that are covered, not for those that are excluded from coverage).

In essence, Graphic Arts/Utica asks this court to hold that a complaint against an insured

may be dissected into its constituent claims, and the duty to defend parceled out to different insurers for different claims at different stages in the litigation. Graphic Arts/Utica cites no precedent for partitioning a complaint in the way it proposes, and such a practice would be at odds with Pennsylvania's holistic approach to the duty to defend. Graphic Arts/Utica's duty to defend CHA arose as to all claims at the outset of the Rosenau litigation–not, as Graphic Arts/Utica argues, after the "injunctive relief portion" of the case had ended and the "damages portion" had begun. *See American Contract Bridge League v. Nationwide Mutual Fire Ins. Co., et al.*, 752 F.2d 71, 76 (3d Cir. 1985) (stating that "the insurance company's refusal to defend at the outset of the controversy is a decision it makes at its own peril"). It defies logic for Graphic Arts/Utica to deny, on the one hand, that its duty to defend arose at the outset of the case and to admit, on the other, that multiple claims in the original complaint were actually covered under the policy. *See The Frog, Switch & Mfg. Co., Inc.*, 193 F.3d at 746 (stating that the duty to defend an insured is broader than the duty to indemnify). The law is clear that Graphic Arts/Utica had a duty to defend CHA in the Rosenau suit as soon as it received notice that the complaint had been filed.

The next question is whether Graphic Arts/Utica breached its duty to defend. It is undisputed that Graphic Arts/Utica did not provide a defense when it issued its reservation of rights to CHA in December 2002, after receiving notice of the Rosenau suit. It is also undisputed that Graphic Arts/Utica retained the law firm of Mallon & Blatcher to defend CHA in December 2003, only after receiving notice of the Rosenaus' amended complaint and more than a year following the commencement of the suit. Applying Pennsylvania law and the terms of the policy to these undisputed facts leads ineluctably to the conclusion that Graphic Arts/Utica breached its

duty to defend when it failed to retain counsel for CHA upon first receiving notice of the

Rosenau suit in November 2002. Although Graphic Arts/Utica eventually retained Mallon &

Blatcher, that action came too late to fully discharge its duty to defend. It is unavailing for

Graphic Arts/Utica to argue that it fulfilled its duty by "monitoring" the defense provided by St.

Paul until the case "heated up," at which time it intervened. On its face, CHA's policy promises

that Graphic Arts/Utica will provide the insured with a defense, not that it will passively monitor

a defense provided by an interested third party until it decides, at its own discretion, to become

actively involved.

Graphic Arts/Utica argues that any breach of the duty to defend on its part should be

excused because CHA breached the consent clause in the policy by hiring Ballard Spahr without

authorization. The consent clause in the Graphic Arts/Utica policy prohibits an insured from

incurring expenses voluntarily without the insurer's consent, except for first aid. *See supra* note

10. It is undisputed that CHA did not have Graphic Arts/Utica's consent before it retained

Ballard Spahr. Assuming *arguendo* that CHA's retention of Ballard Spahr would be considered

voluntary, even in light of the extenuating fact that the Rosenaus sought immediate injunctive

relief to prevent Andrew Rosenau's expulsion, the issue is whether CHA's failure to obtain

consent before retaining counsel excused Graphic Arts/Utica from fulfilling its obligation to

defend the suit.

In Pennsylvania, an insured's breach of a consent clause will excuse an insurer's

performance only upon a showing by the insurer that the breach caused prejudice to the insurer's

defense of the underlying action. *See supra* note 11 (citing cases). Ordinarily, the question of

prejudice is one for the jury; however, the court may, if appropriate under the facts presented,

17

find prejudice or lack thereof as a matter of law. *See Granary Associates, Inc.*, 2000 U.S. Dist. LEXIS at *21. In this case, Graphic Arts/Utica does not argue that it was prejudiced by the breach it alleges, and it offers no facts to establish prejudice. Absent an allegation of prejudice, a breach of the policy's consent clause by CHA cannot be considered a material one and, therefore, cannot absolve Graphic Arts/Utica of its duty to defend under the policy.

Moreover, Graphic Arts/Utica unfairly seeks to penalize CHA for a breach caused by Graphic Arts/Utica's own default. Had Graphic Arts/Utica fulfilled its duty to defend the suit from the outset, Ballard Spahr's involvement in the case might have been limited. By declining to offer a defense when it received notice of the suit, Graphic Arts/Utica defaulted on its contractual obligation and thereby lost the right to complain of CHA's continued representation by Ballard Spahr. *See Kolbe v. Aegis Ins. Co.*, 537 A.2d 7, 8 (Pa. Super. 1987) ("We cannot condone the action of the Defendant in first denying the applicability of its policy and thereafter relying upon a consent requirement in the same policy to defeat a coverage claim."). It is undoubtedly true, as Graphic Arts/Utica argues, that there are many fine lawyers and law firms in Philadelphia who were capable of providing CHA with a competent defense. But the assertion begs the question; the point is that Graphic Arts/Utica declined to retain any of them, leaving CHA to its own devices. CHA's reliance on Ballard Spahr beyond the initial stages of the case is wholly understandable given the fact that St. Paul, the other insurer owing CHA a duty to defend, agreed to retain Ballard Spahr from the beginning.

The standard governing CHA's alleged breach of the cooperation clause is the same as that governing its alleged breach of the consent clause: the breach will not give rise to a defense unless it is substantial and prejudicial. *See supra* note 11 (citing cases). The question of prejudice

is ordinarily one for the trier of fact; however, the issue may be decided on summary judgment in a clear case. *See Associated Indemnity Corp. v. Davis*, 136 F.2d at 74. Graphic Arts/Utica argues that CHA interfered with Mallon & Blatcher's defense of the case when CHA and Ballard Spahr balked at the midstream change in counsel. Again, however, Graphic Arts/Utica does not argue that it was in any way prejudiced by CHA's conduct. On the contrary, the allegations of prejudice go in the other direction, with CHA maintaining that its initial reluctance to cooperate with Mallon & Blatcher was the result of legitimate concern on its part that an eleventh hour substitution of counsel would be prejudicial to the ongoing defense of the Rosenau case. Absent any allegation of prejudice by Graphic Arts/Utica, non-cooperation on CHA's part does not excuse Graphic Arts/Utica's performance.

Alternatively, Graphic Arts/Utica argues that it is not liable for breach of contract because St. Paul, having been the first insurance carrier to acknowledge coverage, is obligated to pay for the entirety of the defense of the Rosenau suit, and because the St. Paul policy, and not the Graphic Arts/Utica policy, provided primary coverage for the claims in the suit. Neither of these arguments is supported by the law. The first argument, in furtherance of which Graphic Arts/Utica cites no authority, has been explicitly rejected by the Third Circuit, applying Pennsylvania insurance law. In *Forum Insurance Co. v. Allied Security, Inc.*, 866 F.2d 80, 85 (3d Cir. 1989), the court held that where an insured covered concurrently by two insurers tenders its defense to one rather than the other, the insurer to whom the defense was not tendered is not thereby absolved of its co-extensive duty to defend.[19]

---

[19]In this case, CHA contacted *both* insurers promptly, requesting a defense from each. To allow an insurer to defer defending its insured in order to deflect the duty—and the associated costs—onto another insurer would be unfair and, as a matter of policy, unsound.

The second argument is equally unpersuasive in light of the plain meaning of the "other insurance" clauses in the two policies. In order to determine the relative obligations of St. Paul and Graphic Arts/Utica with respect to the claims raised in the Rosenau suit, the court must consider the meaning and applicability of these clauses with respect to claims made in the suit. *See Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 767 (3d Cir. 1985) (citing *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 123 A.2d 413 (Pa. 1956)). Under Pennsylvania law, "other insurance" clauses in policies are triggered only where there are two or more policies covering the same interest, the same subject matter, and the same risk. *Id.*

Graphic Arts/Utica argues that the two policies are not "other insurance" as to each other, because they are not the same "type" of insurance.[20] It points out, for example, that its policy

_____

[20]In its brief, Graphic Arts/Utica cites *Blue Anchor Overall Co.*, 123 A.2d 413; *Alberici v. Safeguard Mut. Ins. Co.*, 664 A.2d 110 (Pa. Super. 1995); *Mutual Ben. Ins. Co. v. Goschenhoppen Mut. Ins. Co.*, 572 A.2d 1275 (Pa. Super. 1990); *Pacific Indemnity Co.*, 766 F.2d 754; and *St. Paul Fire & Marine Ins. Co. v. Insurance Placement Facility of Pennsylvania*, 687 F. Supp. 172 (E.D. Pa. 1988). Each of these cases can be distinguished on its facts from the instant case.

*Alberici* involved a dispute over multiple fire insurance policies covering the same piece of real estate, which was purchased with funds belonging jointly to a husband and his wife. Some of the policies were issued in the name of the husband only; others were issued in the name of both parties. The court held that, insofar as claims by the wife were involved, the only policies that were "other insurance" as to each other were those issued jointly to both parties, because only those policies covered the wife's interest in the property. In this case, unlike in *Alberici*, the only policies in question were issued to a single named policy holder: CHA.

*Mutual Benefit Insurance Co.* involved two fire insurance policies—one held by the seller of real property and the other by the buyer. The court held that the policies were "other insurance" as to each other for purposes of proration, because both parties had an interest in the property at the time it was destroyed by fire, and both policies insured the same subject matter (the property) and the same risk (fire). In this case, unlike in *Mutual Benefit Insurance Co.*, the two policies at issue were both held by the same entity: CHA.

*Blue Anchor Overall Co.* also involved fire insurance. The plaintiff, who held three different fire insurance policies, sought to recover from its three insurers for damage to property caused by fire protective equipment. The plaintiff's three fire insurance policies were held not to be "other insurance" as to each other for plaintiff's claim for water damage, because only one of

covers employee benefit programs, while the St. Paul Policy covers employment practices. It altogether ignores, however, the material overlap in coverage between the two policies. For example, both policies cover the same organization; both cover losses relating to personal injury, including defamation, and mental or emotional distress resulting from personal injury;[21] both policies cover losses caused by directors, executive officers, and employees acting within the scope of their duties;[22] and both incorporate a duty to defend or to pay defense costs for suits arising from covered losses.[23]

---

the policies covered damage caused by leakage from fire protective equipment; the other two did not. In this case, both policies covered the same risk (i.e., the risk of personal injury), and the underlying claim was, in part, for losses associated with that risk.

    *Pacific Indemnity Co.* involved a dispute over the relative liability of four different insurers for claims brought by dieters against a doctor who was accused of having committed malpractice by publishing a fad diet book that purportedly led the claimants to become ill. Two of the insurers, both of which provided professional liability insurance for the doctor, were held to have issued policies that were "other insurance" as to each other with respect to the underlying malpractice claims. The other two insurers—one of which provided general liability coverage for bodily injury or property damage, the other of which provided homeowner's coverage for losses resulting from negligent personal acts—were held not to be "other insurance" as to the two professional liability policies with respect to professional malpractice claims brought against the doctor. In this case, which involves underlying claims for personal injury, there are only two carriers involved, and both carriers provided coverage for personal injury.

    [21]Graphic Arts/Utica asserts that the policies cover different risks, but both policies have express provisions extending coverage for personal injury. The Graphic Arts/Utica policy provides that "we will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury.'" The St. Paul policy provides that "the Insurer will pay the Insureds Loss and Defense Costs resulting from...any Claim for Personal Injury."

    [22]Graphic Arts/Utica asserts that the policies cover different insureds, but the policies dictate otherwise. The Graphic Arts/Utica policy provides that, when the policy holder is an organization, "'executive officers' and directors are insureds" and that "'employees,' other than your 'executive officers'" are also insureds. The St. Paul policy provides that "directors, trustees, officers, employees, committee members or volunteers of the Organization" are insureds.

    [23]Neither policy, however, addresses the apportionment of defense costs in a situation where the duty to defend is triggered under more than one policy by the same litigation.

21

Although it is true that the policies do not provide identical coverage, their coverage need not be completely coextensive for them to be considered "other insurance" as to each other. *See Liberty Mutual Ins. Co. v. Home Ins. Co.*, 583 F. Supp. 849, 854 (W.D. Pa. 1984) (citing *Miller v. Home Ins. Co.*, 164 A. 819 (Pa. Super. 1933)). Because both policies provide coverage for CHA and its employees, including directors/trustees and officers, for claims of personal injury, they are "other insurance" as to each other at least for such claims, regardless of any additional coverage provided by either policy. *See, e.g.,id.* (policy covering losses generally is concurrent with policy covering losses due to defective fabric); *Miller* (policy covering loss by tornado is concurrent with policy covering loss by fire and tornado).

Having determined that the policies are "other insurance" as to each other for purposes of at least some of the claims raised in the Rosenau suit, the court must turn to the plain language of the "other insurance" clauses to consider the proper allocation of coverage between insurers. *See Liberty Mutual*, 583 F. Supp. at 854; *American Casualty Co. of Reading, Pa. v. Phico Ins. Co.*, 702 A.2d 1050, 1053 (Pa. 1997). In this case, the policies contain complementary "other insurance" clauses[24] specifying unambiguously that Graphic Arts/Utica will provide primary coverage and St. Paul will provide excess coverage for covered losses whenever other valid

---

[24]A more difficult allocational problem is presented when the "other insurance" clauses in the policies are mutually exclusive. *See Continental Ins. Co. v. McKain*, 821 F. Supp. 1084 (E.D. Pa. 1993) (competing excess insurance clauses); *Liberty Mutual Ins. Co.*, 583 F. Supp. 849 (competing primary insurance clauses); *American Casualty Co. of Reading, Pa.*, 702 A.2d 1050 (competing excess insurance clauses). In such a case, the clauses in both policies cannot be given effect, and the court must decide, in the absence of language in the policies stating a preference for a particular principle of allocation, what constitutes an equitable apportionment. In this case, by contrast, the task of allocation is uncomplicated because the "other insurance" clauses are noncompeting.

insurance is available.[25] Given the unambiguous language of the policies, Graphic Arts/Utica's

---

[25]The Graphic Arts/Utica Policy provides:

4. Other Insurance.
   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

   a. Primary Insurance
      This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c.

   b. Excess Insurance
      This insurance is excess over:
      (1) Any other insurance, whether primary, excess, contingent or on any other basis:
         (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
         (b) That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner; or
         (c) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to the Exclusion g. of Coverage Section A (Section 1).
      (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

*See* Document #41, Exhibit A.

   The St. Paul policy provides:

   XI. OTHER INSURANCE
   This policy is excess of all other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

*See* PMSJ, Exhibit B.

argument that St. Paul is solely, or even primarily, liable for the costs of defending the Rosenau suit prior to Mallon & Blatcher's assumption of the defense is without merit and cannot defeat CHA's motion for summary judgment as to liability on its breach of contract claim. While the law in Pennsylvania may be somewhat unsettled with respect to whether— and, if so, to what extent—an excess insurer is obligated to contribute to the costs of defending its insured, *see General Accident Ins. Co. v. Safety Nat'l Casualty Co.*, 825 F. Supp. 705, 707 (E.D. Pa. 1993), there can be little question that such an insurer cannot solely bear the burden of providing a defense.

The court is satisfied that summary judgment is appropriate on CHA's breach of contract claim against Graphic Arts/Utica. The arguments Graphic Arts/Utica offers to defeat summary judgment are unpersuasive when considered in light of the undisputed facts of the case, the settled law in Pennsylvania, and the unambiguous terms of the two policies. Because there are no genuine issues of material fact, CHA is entitled to judgment as a matter of law as to liability on its breach of contract claim. Graphic Arts/Utica had a duty to defend the Rosenau litigation from its inception, and it breached that duty.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| CHESTNUT HILL ACADEMY,<br>Plaintiff<br>v.<br><br>GRAPHIC ARTS MUT. INS. CO. &<br>UTICA MUT. INS. CO.,<br>Defendants/<br>Third Party Plaintiffs<br>v.<br><br>ST. PAUL FIRE AND MARINE INS. CO.<br>Third Party Defendant | CIVIL ACTION<br>NO. 04-1560 |

## Order

AND NOW, this _____ day of July, 2005, upon consideration of Chestnut Hill Academy's motion for partial summary judgment on its breach of contract claim (Document No. 30), Graphic Arts Mutual Insurance Company/Utica Mutual Insurance Company's motion to strike or, in the alternative, to continue plaintiff's motion for partial summary judgment (Document No. 33), and all of the various responses, replies and joinders, IT IS HEREBY ORDERED that:

1. The motion of Graphic Arts Mutual Insurance Company/Utica Mutual Insurance Company to strike or, in the alternative, to continue plaintiff's motion for partial summary judgment is DENIED.

2. The motion for partial summary judgment of Chestnut Hill Academy is GRANTED. Graphic Arts Mutual Insurance Company/Utica Mutual Insurance Company had a duty to provide Chestnut Hill Academy with a defense under the terms of the insurance policy, and

Graphic Arts Mutual Insurance Company/Utica Mutual Insurance Company breached that duty when it failed to retain counsel to represent Chestnut Hill Academy from the outset of the underlying litigation. Judgment is, therefore, entered in favor of plaintiff and against said defendants as to liability on plaintiff's breach of contract claim.


_____
      William H. Yohn, Jr., Judge